**KERR & WAGSTAFFE LLP**
James M. Wagstaffe (#95535)
Frank Busch (#258288)
101 Mission Street, 18th Floor
San Francisco, California 94105
Telephone: (415) 371-8500
Facsimile: (415) 371-0500
Emails: wagstaffe@kerrwagstaffe.com
      busch@kerrwagstaffe.com

*Local Counsel for Plaintiff Andrew E. Left*

**LABATON SUCHAROW LLP**
Christopher J. Keller
Eric J. Belfi
Michael P. Canty
David J. Schwartz
Francis P. McConville
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Emails: ckeller@labaton.com
      ebelfi@labaton.com
      mcanty@labaton.com
      dschwartz@labaton.com
      fmcconville@labaton.com

*Counsel for Plaintiff Andrew E. Left*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ANDREW E. LEFT, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>   vs.<br><br>TESLA, INC., AND ELON R. MUSK,<br><br>          Defendants. | Case No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

## INTRODUCTION

Plaintiff Andrew E. Left ("Left" or "Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of press releases and other public statements issued by and regarding Tesla, Inc. ("Tesla" or the "Company"), Tesla's filings with the U.S. Securities and Exchange Commission ("SEC"), and media and analyst reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.     This is a securities class action on behalf of all persons other than Defendants (as defined herein) who purchased, sold, or otherwise transacted in Tesla securities between August 7, 2018 and August 17, 2018, both dates inclusive (the "Class Period").  The action is brought against Tesla and its Chairman and Chief Executive Officer ("CEO") Elon R. Musk ("Musk" and together with Tesla, "Defendants") for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.     Tesla Inc. designs, manufactures, and sells high-performance electric vehicles and electric vehicle powertrain components. The Company owns its sales and service network and sells electric powertrain components to other automobile manufacturers.

3.     Defendant Musk has a long-standing public feud with short-sellers and often uses his personal Twitter account to taunt and confront skeptics of his company.  For example, on May 4, 2018, he tweeted that the "short burn of the century [was] comin[g] soon" and that the "sheer magnitude of the short carnage will be unreal. If you're short, I suggest tiptoeing quietly to the exit[.]"  He also tweeted on June 17, 2018 that Tesla short-sellers had "about three weeks before their short position explodes."

4.     By way of background, shorting or short-selling is the sale of a security that is not owned by the seller or that the seller has borrowed.  The practice is motivated by the belief that a

security's price will likely decline, enabling it to be purchased back at a lower price at a profit. By shorting a stock, short-sellers integrate their own experience and interpretation of public information into the market price of that stock, and have on numerous occasions, successfully anticipated stock declines. For example, on August 6, 2018, during a debate video-streamed on *Cheddar*, Mark Spiegel, managing member of Stanphyl Capital and well-known Tesla short-seller, questioned the feasibility of a hypothetical Tesla buyout at a $70 billion enterprise value, stating the stock was "grotesquely overvalued."

5.      As described herein, Defendants artificially manipulated the price of Tesla securities to damage the Company's short-sellers, and in the process, damaged all purchasers of Tesla securities by issuing materially false and misleading information. Defendants' fraudulent scheme started on August 7, 2018, when Defendant Musk, via his verified personal Twitter account, issued the following tweet: "Am considering taking Tesla private at $420. Funding secured." Later that day, Defendant Musk issued another tweet, stating: "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote."

6.      Following these tweets, Tesla's stock price surged, reaching an intraday high of $387.46 per share, before closing at $379.57 per share August 7, 2018, a nearly 11 percent jump from the previous closing price. Trading volume spiked to 30 million shares (compared to an average of 8 million), representing over $11 billion of purchases in the open market. In response to the tweets, many Tesla short-sellers were forced to cover their positions at artificially high prices, losing approximately $1.3 billion in a single day, according to media reports.

7.      The truth about Defendants' fraudulent scheme, and in particular the lack of funding to take Tesla private, began to emerge on August 8, 2018, when certain members of Tesla's Board of Directors issued a statement revealing that the board was still evaluating the prospects of taking Tesla private, and confirmed that such a deal was subject to board approval. On the same day, *The Wall Street Journal* published an article entitled "SEC Probes Tesla CEO Musk's Tweets," reporting that U.S. regulators were inquiring into whether "Elon Musk was truthful when he tweeted that he had secured funding" for the proposed buyout of Tesla. According to the report, SEC officials wanted to know if Musk had a "factual basis" for posting

"that the going-private transaction was all but certain, with only a shareholder vote needed to pull it off."

8.     On news of the SEC probe and board discussions, Tesla's stock price fell $9.23 per share, or 2.43 percent, to close at $370.34 on August 8, 2018.

9.     On August 9, 2018, *Bloomberg* published an article entitled "The SEC Is Intensifying Its Probe of Tesla," reporting that SEC regulators were "intensifying its scrutiny of Tesla Inc.'s public statements in the wake of Elon Musk's provocative tweet Tuesday about taking the electric-car company private."

10.     That same day, *Reuters* published an article entitled "Exclusive - Tesla's board seeking more information on Musk's financing plan – sources," reporting that the Company's board of directors had "not yet received a detailed financing plan from CEO Elon Musk" or "specific information on who will provide the funding."

11.     As a result of these additional disclosures, further indicating that Defendants lacked the funding necessary to take the Company private, Tesla's stock price fell an additional $17.89 per share, or 4.83 percent, to close at $352.45 per share on August 9, 2018.

12.     On August 13, 2018, Defendant Musk tweeted: "I'm excited to work with Silver Lake and Goldman Sachs as financial advisors, plus Wachtell, Lipton, Rosen & Katz and Munger, Tolles & Olson as legal advisors, on the proposal to take Tesla private."

13.     On August 14, 2018, *Bloomberg* published an article entitled "Goldman's Missing Mandate Adds to Clues Musk Tweeted Out of Turn," reporting that neither Goldman Sachs or Silver Lake were yet working with Musk pursuant to a signed agreement or in an official capacity when Musk said on Twitter late Monday, August 13, 2018, both firms were working with him as financial advisers.

14.     Following these revelations, Tesla's stock price fell $8.77 per share, or 2.46 percent, to close at $347.64 per share on August 14. 2018.

15.     On August 16, 2018, after the market close, *The New York Times* published an in-depth interview with Musk entitled "Elon Musk Details 'Excruciating' Personal Toll of Tesla

1    Turmoil," which revealed the stress Musk had been under, his use of Ambien, and the manner in

2    which the August 7, 2018 tweet had been conceived.

3          16.    On this news, Tesla's stock price fell $29.95 per share or 8.92 percent, to close at

4    $305.50 per share on August 17, 2018.

5          17.    As described in detail below, Defendant Musk artificially manipulated the price of

6    Tesla securities with objectively false tweets in order to "burn" the Company's short-sellers.  In

7    the succeeding days, the truth regarding the supposedly "secure" financing needed to effectuate

8    the going-private transaction began to emerge, exposing the fraudulent scheme, and in the

9    process, injuring Class Period investors as the price of Tesla securities deteriorated rapidly.

10         18.    As a result of Defendants' wrongful acts and misleading statements, and the

11   precipitous artificial inflation in the market value of the Company's securities and subsequent

12   decline, Plaintiff and other Class members have suffered significant losses and damages.

13                           **JURISDICTION AND VENUE**

14         19.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange

15   Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17

16   C.F.R. § 240.10b-5.

17         20.    This Court has jurisdiction over the subject matter of this action pursuant to 28

18   U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19         21.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15

20   U.S.C. § 78aa and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged fraud or the

21   effects of the fraud have occurred in this Judicial District.  Tesla's principal executive offices are

22   located within this District.

23         22.    In connection with the acts alleged in this complaint, Defendants, directly or

24   indirectly, used the means and instrumentalities of interstate commerce, including, but not

25   limited to, the mails, interstate telephone communications, and the facilities of the national

26   securities markets.

27

28

**PARTIES**

23.     Plaintiff Andrew E. Left purchased Tesla securities during the Class Period, as set forth in the certification attached hereto, and was damaged as the result of Defendants' wrongdoing as alleged in this complaint. Mr. Left is the author and executive editor of Citron Research, an online investment newsletter that publishes reports seeking to expose companies that are overvalued or engaged in fraud.  Citron Research has been publishing columns for over 17 years, making it one of the longest-running online stock commentary websites.  With over 150 reports, Citron has amassed a track record identifying fraud and terminal business models.

24.     Defendant Tesla is a Delaware corporation with its principal executive offices located at 3500 Deer Creek Road, Palo Alto, California 94304. The Company's stock is listed on the NASDAQ Global Select market ("NASDAQ") under the ticker symbol "TSLA."

25.     Defendant Elon R. Musk co-founded and is the CEO of Tesla and Chairman of the Company's Board of Directors.

26.     Defendant Musk, because of his position within the Company, possessed the power and authority to control the contents of Tesla's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, i.e., the market.  Defendant Musk was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his position and access to material non-public information available to them, Defendant Musk knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  Defendant Musk is liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the actions of Defendant Musk.

27.     Tesla and Musk are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

28.     Tesla Inc. designs, develops, manufactures and sells high-performance fully electric vehicles, and energy generation and storage systems.

29.     By way of background, shorting or short-selling is the sale of a security that is not owned by the seller or that the seller has borrowed.  The practice is motivated by the belief that a security's price will likely decline, enabling it to be purchased back at a lower price at a profit.

30.     Short-sellers, like plaintiff Left, play an important role in the financial market, as by shorting a stock, they integrate their own experience and interpretation of public information into the market price of that stock. Short-sellers also provide liquidity to markets and prevent stocks from being bid up to inflated high levels on hype or over-optimism.  In order to stop short-sellers from trading in their stock, companies sometimes engage in a practice known in the industry as "squeezing the shorts."  To that end, a company may attempt to manipulate or inflate its stock's market price to such an extent that the short-sellers can no longer afford to maintain their position – that is, they are "squeezed out" and forced to purchase stock to cover their position.

31.     Defendant Musk has a long-standing public feud with short-sellers and has threatened them in the recent past.  For example, on May 4, 2018, he tweeted that the "short burn of the century [was] comin[g] soon" and that the "sheer magnitude of the short carnage will be unreal. If you're short, I suggest tiptoeing quietly to the exit[.]" He then tweeted on June 17, 2018 that Tesla short-sellers had "about three weeks before their short position explodes."  As described herein, Defendants' statements were an ill-conceived attempt to artificially manipulate the price of Tesla securities in order to "burn" and "squeeze out" the Company's short-sellers.

### Materially False and Misleading Statements Issued During the Class Period

32.     On August 7, 2018, Defendant Musk posted the following tweet at 12:48 p.m. eastern time: "Am considering taking Tesla private at $420. Funding secured."

33.     At 2:13 p.m. eastern time, Musk tweeted "Shareholders could either to sell 420 or hold shares & go private."

34.     At 3:36 p.m. eastern time, he added: "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote."

35.     That same day, the Company posted on its corporate blog an e-mail from Defendant Musk to Tesla employees reiterating his intent to take the Company private at $420 per share. The email stated in part:

**Taking Tesla Private**

August 7, 2018

*The following email was sent to Tesla employees today:*

Earlier today, I announced that I'm considering taking Tesla private at a price of $420/share. I wanted to let you know my rationale for this, and why I think this is the best path forward.

First, a final decision has not yet been made, but the reason for doing this is all about creating the environment for Tesla to operate best. As a public company, we are subject to wild swings in our stock price that can be a major distraction for everyone working at Tesla, all of whom are shareholders. Being public also subjects us to the quarterly earnings cycle that puts enormous pressure on Tesla to make decisions that may be right for a given quarter, but not necessarily right for the long-term. Finally, as the most shorted stock in the history of the stock market, being public means that there are large numbers of people who have the incentive to attack the company.

***

First, I would like to structure this so that all shareholders have a choice. Either they can stay investors in a private Tesla or they can be bought out at $420 per share, which is a 20% premium over the stock price following our Q2 earnings call (which had already increased by 16%). My hope is for all shareholders to remain, but if they prefer to be bought out, then this would enable that to happen at a nice premium.

Second, my intention is for all Tesla employees to remain shareholders of the company, just as is the case at SpaceX. If we were to go private, employees would still be able to periodically sell their shares and exercise their options. This would enable you to still share in the growing value of the company that you have all worked so hard to build over time.

Third, the intention is not to merge SpaceX and Tesla. They would continue to have separate ownership and governance structures. However, the structure envisioned for Tesla is similar in many ways to the SpaceX structure: external shareholders and employee shareholders have an opportunity to sell or buy approximately every six months.

Finally, this has nothing to do with accumulating control for myself. I own about 20% of the company now, and I don't envision that being substantially different after any deal is completed.

Basically, I'm trying to accomplish an outcome where Tesla can operate at its best, free from as much distraction and short-term thinking as possible, and where there is as little change for all of our investors, including all of our employees, as possible.

This proposal to go private would ultimately be finalized through a vote of our shareholders. If the process ends the way I expect it will, a private Tesla would ultimately be an enormous opportunity for all of us. Either way, the future is very bright and we'll keep fighting to achieve our mission.

Thanks,

Elon

36.     Following these statements, Tesla's stock price surged, reaching an intraday high of $387.46 per share, before closing at $379.57 per share August 7, 2018, a nearly 11 percent jump from the previous closing price.

## **Subsequent Developments Confirm There Was No Funding**

37.     On August 8, 2018, *The Wall Street Journal* published an article entitled "SEC Probes Tesla CEO Musk's Tweets," reporting that U.S. regulators were inquiring whether "Elon Musk was truthful when he tweeted that he had secured funding" for the proposed buyout of Tesla.   Additionally, SEC officials wanted to know if Musk had a "factual basis" for posting "that the going-private transaction was all but certain, with only a shareholder vote needed to pull it off."

38.     On news of the SEC probe, Tesla's stock price fell $9.23 per share, or 2.43 percent, to close at $370.34 on August 8, 2018.

39.     On August 9, 2018, *Bloomberg* published an article entitled "The SEC Is Intensifying Its Probe of Tesla," reporting that SEC regulators were "intensifying its scrutiny of Tesla Inc.'s public statements in the wake of Elon Musk's provocative tweet Tuesday about taking the electric-car company private."

40.     That same day, *Reuters* published an article entitled "Exclusive - Tesla's board seeking more information on Musk's financing plan – sources," reporting that the Company's board of directors had "not yet received a detailed financing plan from Musk and specific information on who will provide the funding."

41.     As a result of these additional disclosures, further indicating that Defendants lacked the funding necessary to take the Company private, Tesla's stock price fell an additional $17.89 per share, or 4.83 percent, to close at $352.45 per share on August 9, 2018.

42.     On August 13, 2018, Defendant Musk tweeted: "I'm excited to work with Silver Lake and Goldman Sachs as financial advisors, plus Wachtell, Lipton, Rosen & Katz and Munger, Tolles & Olson as legal advisors, on the proposal to take Tesla private."

43.     On that day, the Company posted on its corporate blog an "Update on Taking Tesla Private," which stated:

Update on Taking Tesla Private

Elon Musk August 13, 2018

As I announced last Tuesday, I'm considering taking Tesla private because I believe it could be good for our shareholders, enable Tesla to operate at its best, and advance our mission of accelerating the transition to sustainable energy. As I continue to consider this, I want to answer some of the questions that have been asked since last Tuesday.

**What has happened so far?**

On August 2nd, I notified the Tesla board that, in my personal capacity, I wanted to take Tesla private at $420 per share. This was a 20% premium over the ~$350 then current share price (which already reflected a ~16% increase in the price since just prior to announcing Q2 earnings on August 1st). My proposal was based on using a structure where any existing shareholder who wished to remain as a shareholder in a private Tesla could do so, with the $420 per share buyout used only for shareholders that preferred that option.

After an initial meeting of the board's outside directors to discuss my proposal (I did not participate, nor did Kimbal), a full board meeting was held. During that meeting, I told the board about the funding discussions that had taken place (more on that below) and I explained why this could be in Tesla's long-term interest.

At the end of that meeting, it was agreed that as a next step, I would reach out to some of Tesla's largest shareholders. Our largest investors have been extremely supportive of Tesla over the years, and understanding whether they had the ability and desire to remain as shareholders in a private Tesla is of critical importance to me. They are the ones who believed in Tesla when no one else did and they are the ones who most believe in our future. I told the board that I would report back after I had these discussions.

**Why did I make a public announcement?**

The only way I could have meaningful discussions with our largest shareholders was to be completely forthcoming with them about my desire to take the company private. However, it wouldn't be right to share information about going private with just our largest investors without sharing the same information with all investors at the same time. As a result, it was clear to me that the right thing to do

was announce my intentions publicly. To be clear, when I made the public announcement, just as with this blog post and all other discussions I have had on this topic, I am speaking for myself as a potential bidder for Tesla.

**Why did I say "funding secured"?**

Going back almost two years, the Saudi Arabian sovereign wealth fund has approached me multiple times about taking Tesla private. They first met with me at the beginning of 2017 to express this interest because of the important need to diversify away from oil. They then held several additional meetings with me over the next year to reiterate this interest and to try to move forward with a going private transaction. Obviously, the Saudi sovereign fund has more than enough capital needed to execute on such a transaction.

Recently, after the Saudi fund bought almost 5% of Tesla stock through the public markets, they reached out to ask for another meeting. That meeting took place on July 31st. During the meeting, the Managing Director of the fund expressed regret that I had not moved forward previously on a going private transaction with them, and he strongly expressed his support for funding a going private transaction for Tesla at this time. I understood from him that no other decision makers were needed and that they were eager to proceed.

I left the July 31st meeting with no question that a deal with the Saudi sovereign fund could be closed, and that it was just a matter of getting the process moving. This is why I referred to "funding secured" in the August 7th announcement.

Following the August 7th announcement, I have continued to communicate with the Managing Director of the Saudi fund. He has expressed support for proceeding subject to financial and other due diligence and their internal review process for obtaining approvals. He has also asked for additional details on how the company would be taken private, including any required percentages and any regulatory requirements.

Another critical point to emphasize is that before anyone is asked to decide on going private, full details of the plan will be provided, including the proposed nature and source of the funding to be used. However, it would be premature to do so now. I continue to have discussions with the Saudi fund, and I also am having discussions with a number of other investors, which is something that I always planned to do since I would like for Tesla to continue to have a broad investor base. It is appropriate to complete those discussions before presenting a detailed proposal to an independent board committee.

It is also worth clarifying that most of the capital required for going private would be funded by equity rather than debt, meaning that this would not be like a standard leveraged buyout structure commonly used when companies are taken private. I do not think it would be wise to burden Tesla with significantly increased debt.

Therefore, reports that more than $70B would be needed to take Tesla private dramatically overstate the actual capital raise needed. The $420 buyout price would only be used for Tesla shareholders who do not remain with our company if it is private. My best estimate right now is that approximately two-thirds of shares owned by all current investors would roll over into a private Tesla.

**What are the next steps?**

As mentioned earlier, I made the announcement last Tuesday because I felt it was the right and fair thing to do so that all investors had the same information at the same time. I will now continue to talk with investors, and I have engaged advisors to investigate a range of potential structures and options. Among other things, this will allow me to obtain a more precise understanding of how many of Tesla's existing public shareholders would remain shareholders if we became private.

If and when a final proposal is presented, an appropriate evaluation process will be undertaken by a special committee of Tesla's board, which I understand is already in the process of being set up, together with the legal counsel it has selected. If the board process results in an approved plan, any required regulatory approvals will need to be obtained and the plan will be presented to Tesla shareholders for a vote.

44.     On August 13, 2018, *The New York Times* published an article entitled "Tesla Board Surprised by Elon Musk's Tweet on Taking Carmaker Private," reporting that some members of Tesla's Board were "totally blindsided by Mr. Musk's decision to air his plan on Twitter," which had not been "cleared" by the Board.  Additionally, the Saudi fund referenced earlier by Musk "had taken none of the steps" that a potential going-private transaction would entail, *i.e.* preparing a term sheet or hiring a financial adviser to work on the deal.  According to the article, "in a conversation with an informal adviser about the mess he had gotten himself into, Mr. Musk said he had taken to Twitter impulsively.  He said he had done so because he was not the kind of person who could hold things in, and was angry at the company's critics."

45.     On August 14, 2018, *Bloomberg* published an article entitled "Goldman's Missing Mandate Adds to Clues Musk Tweeted Out of Turn," reporting that neither Goldman Sachs or Silver Lake were yet working with Musk pursuant to a signed agreement or in an official capacity when Musk said on Twitter late Monday, August 13, 2018, both firms were working with him as financial advisers.

46.     Following these revelations, Tesla's stock price fell $8.77 per share, or 2.46 percent, to close at $347.64 per share on August 14. 2018.

47.     On August 16, 2018, after the market close, *The New York Times* published an in-depth interview with Musk entitled "Elon Musk Details 'Excruciating' Personal Toll of Tesla Turmoil," which revealed the stress Musk had been under, his use of Ambien, and the manner in which the August 7, 2018 had been conceived. The interview stated in part:

Elon Musk was at home in Los Angeles, struggling to maintain his composure. "This past year has been the most difficult and painful year of my career," he said. "It was excruciating."

***

Asked if the exhaustion was taking a toll on his physical health, Mr. Musk answered: "It's not been great, actually. I've had friends come by who are really concerned."

The events set in motion by Mr. Musk's tweet have ignited a federal investigation and have angered some board members, according to people familiar with the matter. Efforts are underway to find a No. 2 executive to help take some of the pressure off Mr. Musk, people briefed on the search said. And some board members have expressed concern not only about Mr. Musk's workload but also about his use of Ambien, two people familiar with the board said.

***

In the interview, Mr. Musk provided a detailed timeline of the events leading up to the Twitter postings on Aug. 7 in which he said he was considering taking the company private at $420 a share. He asserted that he had "funding secured" for such a deal — a transaction likely to be worth well over $10 billion.

That morning, Mr. Musk woke up at home with his girlfriend, the musician known as Grimes, and had an early workout. Then he got in a Tesla Model S and drove himself to the airport. En route, Mr. Musk typed his fateful message.

Mr. Musk has said he saw the tweet as an attempt at transparency. He acknowledged Thursday that no one had seen or reviewed it before he posted it.

***

What Mr. Musk meant by "funding secured" has become an important question. Those two words helped propel Tesla's shares higher.

But that funding, it turned out, was far from secure.

Mr. Musk has said he was referring to a potential investment by Saudi Arabia's government investment fund. Mr. Musk had extensive talks with representatives of the $250 billion fund about possibly financing a transaction to take Tesla private — maybe even in a manner that would have resulted in the Saudis' owning most of the company. One of those sessions took place on July 31 at the Tesla factory in the Bay Area, according to a person familiar with the meeting. But the Saudi fund had not committed to provide any cash, two people briefed on the discussions said.

***

Mr. Musk's tweet kicked off a chain reaction.

An hour and 20 minutes after the tweet, with Tesla's shares up 7 percent, the Nasdaq stock exchange halted trading, and Tesla published a letter to employees from Mr. Musk explaining the rationale for possibly taking the company private. When the shares resumed trading, they continued their climb, ending the day with an 11 percent gain.

The next day, investigators in the San Francisco office of the Securities and Exchange Commission asked Tesla for explanations. Ordinarily, such material information about a public company's plans is laid out in detail after extensive internal preparation and issued through official channels. Board members, blindsided by the chief executive's market-moving statement, were angry that they had not been briefed, two people familiar with the matter said. They scrambled to cobble together a public statement trying to defuse a mounting uproar over the seemingly haphazard communication.

\*\*\*

The S.E.C. investigation appears to be intensifying rapidly. Just days after the agency's request for information, Tesla's board and Mr. Musk received S.E.C. subpoenas, according to a person familiar with the matter. Board members and Mr. Musk are preparing to meet with S.E.C. officials as soon as next week, the person said.

\*\*\*

He blamed short-sellers — investors who bet that Tesla's shares will lose value — for much of his stress. He said he was bracing for "at least a few months of extreme torture from the short-sellers, who are desperately pushing a narrative that will possibly result in Tesla's destruction."

Referring to the short-sellers, he added: "They're not dumb guys, but they're not supersmart. They're O.K. They're smartish."

\*\*\*

To help sleep when he is not working, Mr. Musk said he sometimes takes Ambien. "It is often a choice of no sleep or Ambien," he said.

But this has worried some board members, who have noted that sometimes the drug does not put Mr. Musk to sleep but instead contributes to late-night Twitter sessions, according to a person familiar with the board's thinking. Some board members are also aware that Mr. Musk has on occasion used recreational drugs, according to people familiar with the matter.

48.     On that same day, *The Wall Street Journal* reported that the "SEC is investigating whether Mr. Musk intentionally misled investors when he tweeted about the proposal in a bid to hurt short-sellers by driving up Tesla's stock price," citing a person familiar with the matter.  The article further stated that "regulators are pressing Tesla's directors to reveal how much information Mr. Musk shared with them before he tweeted about it last week."

49.     On this news, Tesla's stock price fell $29.95 per share or 8.92 percent, to close at $305.50 per share on August 17, 2018.

**POST-CLASS PERIOD DISCLOSURES**

50.     Later developments have further confirmed that funding was never secured as of August 7, 2018, in direct contradiction to Defendant Musk's tweets.  On August 24, 2018, *CNBC* published an article entitled "Elon Musk hiring Morgan Stanley probably closed the book on 'funding secured,'" reporting that hiring the bank essentially ended any doubt as to whether Musk had, in fact, secured funding for the deal.  The article stated in relevant part:

> Tesla CEO Elon Musk's hiring of Morgan Stanley this week is just a small step in his ongoing quest to take Tesla private.

> But it has a larger, more damning implication: he probably didn't have funding secured, even in the most loose sense of the phrase.

> Musk is on the verge of hiring Morgan Stanley because the bank excels in rounding up financing from a wide array of sources, according to a person familiar with the matter. Musk has already retained Goldman Sachs to advise his attempt at taking the company private, first announced in an August 7 tweet. Morgan Stanley will be brought in the same capacity -- to raise money for a potential deal.

> Musk wouldn't need to hire Morgan Stanley if he had secured funding at this point. The board's special committee still hasn't retained an investment bank, and there is no indication anything will happen quickly with regard to a privatization, said two people familiar with the matter, who asked not to be named because the discussions are private.

> Musk said in that tweet he had "funding secured" to take Tesla private at $420 a share. He followed that tweet up with a public statement on August 13 saying he'd met with the Saudi Arabian sovereign wealth fund several times, which prompted him to tweet that he had secured financing. Musk is also using private equity firm Silver Lake as an adviser, which the New York Times reported could be interested in a private investment.

> The Saudi Public Investment Fund hasn't made a public comment supporting Musk's claim in the nearly two weeks that have followed his statement. It's still unclear exactly how much money Musk will need to raise from outside investors -- that will depend on how many existing shareholders roll over their investments into a theoretically privatized company. Musk suggested two-thirds of investors might do so, which would result in a need for about $24 billion in outside capital at $420 per share.

> Musk wrote in his August 13 blog post that the managing director of the Saudi fund needed more detail before moving forward with an investment, "including the proposed nature and source of the funding to be used." Musk acknowledged in his post he planned to speak to other investors. Morgan Stanley and Goldman will help him find them. They have not started this task, the people said.

> The board will also have to vet that $420 number, which may have to rise after the special committee does its due diligence, including calling around to outside parties that may be willing to pay more.

51.     On August 24, 2018, after the market close, the Company revealed through a post on its corporate blog that the Company would remain public, adding that existing shareholders believed the Company to be "better off as a public company."

52.     Following this revelation, *The Associated Press* reported the following day: "First it was the shocking tweet that funding was secured and Tesla may go private, then a statement that the money wasn't locked down after all. Two weeks later it's never mind, the whole deal is off…. Chaos, though, comes with a price. Experts say it all could wind up with Tesla exposed to a fine for misleading investors. And even though Musk has almost legendary status, the episode could further erode his credibility with stakeholders who have endured multiple broken promises and years of losses as a public company."

**ADDITIONAL SCIENTER ALLEGATIONS**

53.     During the Class Period, as alleged herein, Defendant Musk acted with scienter in that Defendant Musk knew or was reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or was reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

54.     Defendant Musk permitted Tesla to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's securities.

55.     As set forth herein, Defendant Musk, by virtue of his receipt of information reflecting the true facts regarding Tesla, his control over, receipt, and/or modification of Tesla's allegedly materially misleading statements and omissions, and/or his position with the Company that made him privy to confidential information concerning Tesla, participated in the fraudulent scheme alleged herein.

56.     Defendant Musk is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on persons or entities who purchased, sold, or

otherwise transacted in Tesla securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding Tesla's business, operations, and management and the intrinsic value of Tesla securities and caused Plaintiff and members of the Class to purchase Tesla securities at artificially inflated prices.

**LOSS CAUSATION/ECONOMIC LOSS**

57.     During the Class Period, as detailed herein, Tesla and Defendant Musk made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Tesla securities, and operated as a fraud or deceit on Class Period purchasers of Tesla securities by misrepresenting the Company's business and prospects.  Later, when Defendants' prior misrepresentations and fraudulent conduct became known to the market, the price of Tesla securities declined as the prior artificial inflation came out of the price over time.  As a result of their purchases of Tesla securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET**

58.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased Tesla securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

59.     At all relevant times, the markets for Tesla securities were efficient for the following reasons, among others:

(a)     as a regulated issuer, Tesla filed periodic public reports with the SEC;

(b)     Tesla regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     Tesla was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     Tesla securities were actively traded in an efficient market, namely the NASDAQ, under the ticker symbol "TSLA."

60.     As a result of the foregoing, the market for Tesla securities promptly digested current information regarding Tesla's from publicly available sources and reflected such information in Tesla's stock price.  Under these circumstances, all purchasers of Tesla securities during the Class Period suffered similar injury through their purchase of Tesla securities at artificially inflated prices and the presumption of reliance applies.

61.     Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## **NO SAFE HARBOR**

62.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when

made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Tesla who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

63.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased, sold, or otherwise transacted in Tesla securities between August 7, 2018 and August 17, 2018, both dates inclusive (the "Class Period").  Excluded from the Class are Defendants, members of the immediate family of Defendant Musk, any subsidiary or affiliate of Tesla, and the directors and officers of Tesla and their families and affiliates at all relevant times.

64.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of July 27, 2018, there were 170,593,144 shares of the registrant's common stock outstanding.

65.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the Exchange Act was violated by Defendants;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements

1   were false and misleading;

2        (e)    Whether the price of Tesla securities was artificially inflated; and

3        (f)    The extent of damage sustained by Class members and the appropriate

4   measure of damages.

5        66.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class

6   sustained damages from Defendants' wrongful conduct.

7        67.    Plaintiff will adequately protect the interests of the Class and has retained counsel

8   experienced in securities class action litigation.  Plaintiff has no interests that conflict with those

9   of the Class.

10       68.    A class action is superior to other available methods for the fair and efficient

11   adjudication of this controversy.

12   **CLAIMS FOR RELIEF**

13   **COUNT I**
**For Violation of Section 10(b) of the Exchange Act**

14   **and Rule 10b-5 Against All Defendants**

15       69.    Plaintiff repeats and realleges each and every allegation contained in the

16   foregoing paragraphs as if fully set forth herein.

17       70.    During the Class Period, Defendants disseminated or approved the false

18   statements specified above, which they knew or recklessly disregarded were misleading in that

19   they contained misrepresentations and failed to disclose material facts necessary in order to make

20   the statements made, in light of the circumstances under which they were made, not misleading.

21       71.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that

22   they:

23        (a)    Employed devices, schemes, and artifices to defraud;

24        (b)    Made untrue statements of material facts or omitted to state material facts

25   necessary in order to make the statements made, in light of the circumstances under which they

26   were made, not misleading; or

27        (c)    Engaged in acts, practices, and a course of business that operated as a

28   fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of

1  Tesla securities during the Class Period.

2      72.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity

3  of the market, they paid artificially inflated prices for Tesla securities.  Plaintiff and the Class

4  would not have purchased Tesla securities at the prices they paid, or at all, if they had been

5  aware that the market prices had been artificially and falsely inflated by Defendants' misleading

6  statements.

7      73.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff

8  and the other members of the Class suffered damages in connection with their purchases of Tesla

9  securities during the Class Period.

10                              **COUNT II**
                **For Violation of Section 10(b) of the Exchange Act**
11           <u>**and Rule 10b-5 For Market Manipulation Against All Defendants**</u>

12     74.    Plaintiff repeats and realleges each and every allegation set forth above as if set

13  forth in full herein.

14     75.    Defendants, individually and in concert, directly and indirectly, by the use, means

15  or instrumentalities of interstate commerce and/or of the mails, engaged in manipulative acts that

16  resulted in a short squeeze that drove the price of Tesla shares to artificially high levels on

17  August 7, 2018.

18     76.    Defendants' market manipulation caused Plaintiff's losses.

19     77.    At the time of Defendants' manipulation, Plaintiff was ignorant of Defendants'

20  manipulative acts.

21     78.    Defendants had actual knowledge of the material facts alleged herein, and

22  knowingly intended to deceive Plaintiff for the purpose of manipulating the price of Tesla

23  securities.

24     79.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange

25  Act and Rule 10b-5.

26

27

28

**COUNT III**
**For Violation of Section 20(a) of the Exchange Act**
**Against Defendant Musk**

80.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

81.     Defendant Musk acted as controlling persons of Tesla within the meaning of Section 20(a) of the Exchange Act.  By virtue of his position and his power to control public statements about Tesla, Defendant Musk had the power and ability to control the actions of Tesla and its employees.  By reason of such conduct, Defendant Musk is liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.     Awarding Plaintiff and the members of the Class damages and interest;

C.     Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.


DATED:  September 6, 2018

*/s/James M. Wagstaffe*
**KERR & WAGSTAFFE LLP**
James M. Wagstaffe (#95535)
Frank Busch (#258288)
101 Mission Street, 18th Floor
San Francisco, California 94105
Telephone: (415) 371-8500
Facsimile: (415) 371-0500
Emails: wagstaffe@kerrwagstaffe.com
          busch@kerrwagstaffe.com

*Local Counsel for Plaintiff Andrew E. Left*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LABATON SUCHAROW LLP**
Christopher J. Keller
Eric J. Belfi
Michael P. Canty
David J. Schwartz
Francis P. McConville
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Emails: ckeller@labaton.com
          ebelfi@labaton.com
          mcanty@labaton.com
          dschwartz@labaton.com
          fmcconville@labaton.com

*Counsel for Plaintiff Andrew E. Left*

## CERTIFICATION

I, Andrew E. Left, hereby certify as follows:

1.      I have reviewed a complaint filed against Tesla, Inc. ("Tesla") alleging violations of the federal securities laws, and generally adopt its allegations without waiving the right to alter the allegations in a consolidated and/or amended complaint;

2.      I did not transact in the securities of Tesla at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      I am willing to serve as a lead plaintiff or representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.      My transactions in Tesla securities during the Class Period are reflected in Exhibit A, attached hereto;

5.      I have not sought to serve as a lead plaintiff in any class action filed under the federal securities laws during the last three years;

Beyond my pro rata share of any recovery, I will not accept payment for serving as a representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 31st day of August, 2018.

_____
Andrew E. Left

# EXHIBIT A

# TRANSACTIONS IN TESLA, INC.

| Account | Security | Transaction Type | Trade Date | Quantity | Unit Price | Cost/Proceeds |
|---------|----------|------------------|------------|----------|------------|----------------|
| Account 1 | TSLA Common Stock | Buy | 8/7/2018 | 9,000.00 | $350.07 | ($3,150,630.00) |
| Account 1 | TSLA Common Stock | Sell | 8/7/2018 | -9,000.00 | $342.29 | $3,080,610.00 |
| | | | | | | |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/7/2018 | 3,000.00 | $344.70 | ($1,034,100.00) |
| Account 2 | TSLA Common Stock | Short Sale | 8/7/2018 | -6,000.00 | $342.57 | $2,055,420.00 |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/7/2018 | 5,000.00 | $346.18 | ($1,730,900.00) |
| Account 2 | TSLA Common Stock | Short Sale | 8/7/2018 | -2,000.00 | $340.88 | $681,760.00 |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/7/2018 | 2,000.00 | $353.85 | ($707,700.00) |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/7/2018 | 1,000.00 | $353.85 | ($353,850.00) |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/7/2018 | 9,000.00 | $353.85 | ($3,184,650.00) |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/7/2018 | 3,000.00 | $353.85 | ($1,061,550.00) |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/7/2018 | 4,000.00 | $355.96 | ($1,423,840.00) |
| Account 2 | TSLA Common Stock | Short Sale | 8/7/2018 | -7,000.00 | $359.25 | $2,514,750.00 |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/7/2018 | 2,000.00 | $361.97 | ($723,940.00) |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/7/2018 | 3,500.00 | $368.43 | ($1,289,505.00) |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/7/2018 | 1,500.00 | $367.74 | ($551,610.00) |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/7/2018 | 1,000.00 | $367.74 | ($367,740.00) |
| Account 2 | TSLA Common Stock | Short Sale | 8/7/2018 | -8,000.00 | $358.23 | $2,865,840.00 |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/7/2018 | 4,000.00 | $361.78 | ($1,447,120.00) |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/7/2018 | 4,000.00 | $367.79 | ($1,471,160.00) |
| Account 2 | TSLA Common Stock | Short Sale | 8/7/2018 | -6,000.00 | $380.65 | $2,283,900.00 |
| Account 2 | TSLA Common Stock | Short Sale | 8/7/2018 | -1,500.00 | $374.83 | $562,245.00 |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/7/2018 | 3,000.00 | $378.64 | ($1,135,920.00) |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/8/2018 | 4,500.00 | $371.22 | ($1,670,490.00) |

| Account | Security | Transaction Type | Trade Date | Quantity | Unit Price | Cost/Proceeds |
|---|---|---|---|---|---|---|
| Account 2 | TSLA Common Stock | Short Sale | 8/8/2018 | -5,000.00 | $375.30 | $1,876,500.00 |
| Account 2 | TSLA Common Stock | Short Sale | 8/8/2018 | -3,133.00 | $369.25 | $1,156,860.25 |
| Account 2 | TSLA Common Stock | Short Sale | 8/8/2018 | -1,867.00 | $368.86 | $688,661.62 |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/9/2018 | 10,000.00 | $363.00 | ($3,630,000.00) |
| Account 2 | TSLA Common Stock | Short Sale | 8/9/2018 | -4,600.00 | $359.81 | $1,655,126.00 |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/9/2018 | 4,600.00 | $362.11 | ($1,665,706.00) |
| Account 2 | TSLA Common Stock | Short Sale | 8/9/2018 | -2,000.00 | $359.38 | $718,760.00 |
| Account 2 | TSLA Common Stock | Short Sale | 8/9/2018 | -3,000.00 | $356.64 | $1,069,920.00 |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/9/2018 | 5,000.00 | $357.94 | ($1,789,700.00) |
| Account 2 | TSLA Common Stock | Short Sale | 8/9/2018 | -5,000.00 | $350.48 | $1,752,400.00 |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/9/2018 | 5,000.00 | $352.09 | ($1,760,450.00) |
| Account 2 | TSLA Common Stock | Short Sale | 8/10/2018 | -3,000.00 | $349.95 | $1,049,850.00 |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/10/2018 | 3,000.00 | $350.57 | ($1,051,710.00) |
| Account 2 | TSLA Common Stock | Short Sale | 8/17/2018 | -3,000.00 | $328.00 | $984,000.00 |
| Account 2 | TSLA Common Stock | Short Sale | 8/17/2018 | -1,000.00 | $326.27 | $326,270.00 |
| Account 2 | TSLA Common Stock | Short Sale | 8/17/2018 | -1,000.00 | $322.29 | $322,290.00 |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/17/2018 | 5,000.00 | $325.54 | ($1,627,700.00) |
| Account 2 | TSLA Common Stock | Short Sale | 8/17/2018 | -5,000.00 | $309.98 | $1,549,900.00 |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/17/2018 | 5,000.00 | $309.09 | ($1,545,450.00) |
| Account 2 | TSLA Common Stock | Short Sale | 8/17/2018 | -8,000.00 | $307.54 | $2,460,320.00 |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/17/2018 | 1,500.00 | $308.58 | ($462,870.00) |
| Account 2 | TSLA Common Stock | Cover Purchase | 8/17/2018 | 6,500.00 | $305.50 | ($1,985,750.00) |
| Account 2 | TSLA Common Stock | Buy | 8/9/2018 | 7,000.00 | $360.99 | ($2,526,930.00) |
| Account 2 | TSLA Common Stock | Buy | 8/9/2018 | 5,000.00 | $361.83 | ($1,809,150.00) |
| Account 2 | TSLA Common Stock | Buy | 8/9/2018 | 3,000.00 | $362.90 | ($1,088,700.00) |
| Account 2 | TSLA Common Stock | Sell | 8/10/2018 | -3,000.00 | $350.05 | $1,050,150.00 |
| Account 2 | TSLA Common Stock | Sell | 8/10/2018 | -3,500.00 | $348.90 | $1,221,150.00 |
| Account 2 | TSLA Common Stock | Sell | 8/10/2018 | -5,100.00 | $346.56 | $1,767,456.00 |
| Account 2 | TSLA Common Stock | Buy | 8/10/2018 | 15,000.00 | $356.18 | ($5,342,700.00) |
| Account 2 | TSLA Common Stock | Sell | 8/10/2018 | -15,000.00 | $353.64 | $5,304,600.00 |
| Account 2 | TSLA Aug 24 '18 $355 Call | Short Sale | 8/9/2018 | -50.00 | $15.65 | $78,250.00 |

2

| Account | Security | Transaction Type | Trade Date | Quantity | Unit Price | Cost/Proceeds |
|---|---|---|---|---|---|---|
| Account 2 | TSLA Aug 24 '18 $355 Call | Cover Purchase | 8/17/2018 | 50.00 | $1.12 | ($5,600.00) |
| | | | | | | |
| Account 2 | TSLA Nov 16 '18 $360 Call | Short Sale | 8/9/2018 | -80.00 | $35.22 | $281,760.00 |
| Account 2 | TSLA Nov 16 '18 $360 Call | Cover Purchase | 8/10/2018 | 80.00 | $34.65 | ($277,200.00) |
| | | | | | | |
| Account 2 | TSLA Sep 21 '18 $320 Call | Short Sale | 8/9/2018 | -50.00 | $42.00 | $210,000.00 |
| Account 2 | TSLA Sep 21 '18 $320 Call | Cover Purchase | 8/10/2018 | 90.00 | $47.60 | ($428,400.00) |
| Account 2 | TSLA Sep 21 '18 $320 Call | Short Sale | 8/17/2018 | -30.00 | $22.00 | $66,000.00 |
| | | | | | | |
| Account 2 | TSLA Aug 31 '18 $302.50 Call | Short Sale | 8/17/2018 | -40.00 | $21.00 | $84,000.00 |
| | | | | | | |
| Account 2 | TSLA Nov 16 '18 $330 Call | Short Sale | 8/16/2018 | -60.00 | $37.39 | $224,340.00 |
| Account 2 | TSLA Nov 16 '18 $330 Call | Short Sale | 8/17/2018 | -60.00 | $27.09 | $162,540.00 |
| Account 2 | TSLA Nov 16 '18 $330 Call | Cover Purchase | 8/17/2018 | 120.00 | $26.36 | ($316,320.00) |